THE STATE, FORMAN S. HUTCHINSON ET AL., PROSECU-
TORS, v. THE MAYOR AND COUNCIL OF THE BOROUGH
OF BELMAR AND THE ATLANTIC COAST ELECTRIC
RAILROAD COMPANY.

1. When the governing body of a municipality receives a petition under the act of April 21st, 1896 (*Pamph. L.*, p. 329), for permission to construct, operate and maintain a street railroad, and at a regular meeting designates a time and place to consider the application, and notice is given and consents of landowners are filed as required by said act, the ordinance granting such permission, after a hearing of the matter, may be passed at the time so designated or at any subsequent time to which the hearing may be adjourned. The hearing may be adjourned from time to time until final action.

2. A restriction on a municipality that an ordinance shall be submitted in writing at a regular meeting and passed at a subsequent meeting, does not apply to an ordinance passed under said act.

3. An ordinance passed under said act will support a location of tracks and poles without the procedure prescribed by earlier statutes

4. A location of tracks and poles may be included in such an ordinance or may be made by a subsequent resolution.

5 A requirement that the railroad company shall pay the incidental expense of such an ordinance and a reasonable counsel fee, is not illegal or improper.

6. If permission is asked to construct a street railroad upon a route partly outside the jurisdiction of a municipality, it will be sufficient to support a grant for the part of the route within such jurisdiction that consents of the owners of the requisite proportion of frontage upon that part of the route be obtained and filed.

7. A revocation of a consent given under said act is not operative if notice thereof is not given before the passage of the ordinance, either to the petitioning company or to the governing body of the municipality. *Quære.* Is such a consent revocable?

8. The mayor and council of a borough chosen under one of the Borough acts repealed by the Borough act of 1896 (*Pamph. L.*, p. 339), and exercising local government at the time of the approval of that act, were thereby authorized to continue such government under the Borough act of 1878 (*Gen. Stat.*, p. 179) until the annual election under said act of 1878, and could in the meantime lawfully proceed under said Street Railroad act of 1896. A majority of the council constituted a quorum, and a majority of a quorum could lawfully pass ordinances and resolutions.

On *certiorari* to review an ordinance of the council of the borough of Belmar.

Argued at November Term, 1897, before Justices VAN SYCKEL, DIXON and COLLINS.

For the prosecutors, *Aaron E. Johnston.*

For the defendants, *Allan L. McDermott.*

The opinion of the court was delivered by

COLLINS, J.    The *certiorari* in this cause brings up an ordinance of the mayor and council of the borough of Belmar granting to the Atlantic Coast Electric Railroad Company a location of tracks upon its filed route through that borough, and permission to construct, operate and maintain an electric street railroad upon the streets designated therein.    The legislation involved is the organic law of the company, approved March 14th, 1893, commonly called the Traction act (*Gen. Stat., p.* 3235), and the act to regulate the construction, operation and maintenance of street railroads, approved April 21st, 1896.    *Pamph. L., p.* 329.    It was observed in *Camden Horse Railroad Co.* v. *Traction Co.,* 29 *Vroom* 102, that no reason was perceived why a location of tracks and permission to construct, operate and maintain a street railroad, although authorized by separate statutes, should not be embraced in the same petition and ordinance, if all statutory requirements have been fulfilled.    That course was adopted in this case, and was, we think, unobjectionable.   Indeed, the act of 1896 covers the whole subject, and a petition under the act of 1893 seems to be no longer necessary.

Numerous causes are assigned for reversal.   One is that the ordinance does not prescribe with sufficient certainty the manner in which and the places where the rails, wires and poles of the railroad shall be erected and placed.   We have not examined the ordinance and accompanying maps in this regard, because the objection is not presented in the brief of

counsel. We mention the subject only to call attention to the fact that the act of 1896 permits it to be dealt with by subsequent resolution of the council. The objection, therefore, if. well founded, would not avoid the general grant of the ordinance. Any indefiniteness in these details can be remedied.

Another complaint is of a requirement in the ordinance, that the railroad company shall pay the printing and other incidental expenses, and counsel fees not exceeding $100. It is suggested that this requirement is against public policy and therefore renders the ordinance void. We think it entirely proper that the company should bear these expenses. To exact them was no more than performance of a duty to the public.

The remaining causes assigned for reversal may be conveniently grouped under three heads, namely—*first*, as to the legal authority of the council; *second*, as to the consent of landowners, and *third*, as to the regularity of the passage of the ordinance.

*First.* Belmar was organized under the Borough act of 1890 (*Gen. Stat., p.* 225), held unconstitutional at the November Term, 1895, of the Court of Errors and Appeals. *Attorney-General* v. *Anglesea,* 29 *Vroom* 372. On April 21st, 1896 (*Pamph. L., p.* 339) there was enacted a statute repealing that act and other statutes, and creating every *de facto* borough formed thereunder a borough *de jure*, with the powers of the General Borough act of 1878 and of all other general laws relating to boroughs. It provided that the presiding officers and members of the governing body of every such borough should become the mayor and councilmen of the borough created in its stead, and should continue in office until the next succeeding annual borough election. All other offices were declared vacant, and the mayor and council were directed to fill, by appointment, all offices required by the general act of 1878. There had been an election in Belmar on March 10th, 1896, and the new council had organized on the third Tuesday of that month. It is argued for the prosecutors that such election was void and that the mayor and council in-

tended by the Borough act of 1896 must have been those in office in November, 1895, when the act of 1890 was declared unconstitutional. This is a mistaken view. The judgment in the Anglesea case had no effect except upon the borough of Anglesea. It would have led, of course, to a like judgment if the franchise of Belmar had been attacked, but it was not attacked, and the borough was regularly exercising local government under the act. It was to the persons in office at the time the Borough act of 1896 took effect that that statute applied. Those persons became the mayor and council of Belmar under color of law, at least, and the case shows that they were, at the time of the petition and subsequent passage of the ordinance in question, administering the only local government in force within the borough territory. They were the proper authorities to act in the premises, and their action cannot be collaterally attacked.

*Second.* Under the Street Railroad act of 1896, a grant of permission to construct, operate and maintain a street railroad can only be made upon there being filed with the clerk of the governing body of the municipality the consent in writing (executed and acknowledged as a deed must be to be recorded) of the owner or owners of at least one-half in amount, in lineal feet, of property fronting on the streets through or upon which permission to construct the railroad is asked. Some of the consents filed in this case are challenged by the prosecutors. One from I. T. Lewis is challenged because, although he held record title in his own name, he is styled in the consent trustee for Hudson estate, and because he added a proviso that the railroad should be built to a certain point by February, 1898. Doubtless, Mr. Lewis held the land under a trust not declared. The act provides that an executor or trustee holding the legal title or having power of sale may sign the required consent. Mr. Lewis certainly holds the legal title, and we do not see how his consent can be disregarded simply because he says he is a trustee. The proviso to his consent did not nullify it and was fully recognized. The ordinance exacts that the entire railroad shall be

finished by July 1st, 1897, unless prevented by legal restraint. Mr. Lewis is not complaining on either ground of objection, and the prosecutors cannot complain for him. Two other consents are challenged. They are from executors. The objection urged is that the consents do not recite that there is either legal title or power of sale in the executor. The act does not require any such recital. The council could satisfy itself on that point. In the absence of proof to the contrary we must presume authority. It is claimed that some consents were revoked. No notice of revocation was given to the railroad company, and only one such notice was given to the council. That one was withdrawn, and there was enough frontage even if that revocation should be upheld. Without passing on the right to revoke consents of the character of those given under the act of 1896, it is clear that mere intention to revoke a consent will not avoid municipal action based upon it. There can be no complete revocation of a consent without notice to the municipality or the railroad company before the passage of the ordinance. Proof is offered in this case that a member of the council who opposed the ordinance knew that revocations were to be presented, and so informed the mayor, and that the mayor remarked to the person handing in the revocation, afterwards withdrawn, that it was not recorded in the office of the county clerk, as the consents had been. This remark seems to have led to the withdrawal, and a report of it to have led other persons present with unrecorded revocations to infer that it would be useless to present them to the council, and therefore to refrain from doing so. This proof is unavailing. There was no fraud or deception practiced, and the railroad company's vested rights cannot be disturbed by reason of the landowners' mistake. It should be remarked that none of those who contemplated revoking their consent are now complaining. The further objection is made that, while it is true that consents may have been filed for the requisite proportion of street-frontage for which the permission to construct the railroad was granted, it is otherwise as to the distance asked for. The application carried

the proposed railroad to the north line of the borough. The ordinance stops short of that point. It is not necessary to determine the absolute right of the council to act *pro tanto* where the application is for a specified route and the owners of the requisite proportion of frontage on that entire route do not consent. In this case the omitted part of the route was on the county bridge over the Shark river, which, while within the territorial limits of the borough, was not within its jurisdiction. It was as if the route asked for lay partly without the borough limits. Consent of the owners of the requisite proportion of the frontage within the council's jurisdiction was sufficient.

*Third.* The complaint of irregularity in the passage of the ordinance is threefold. 1. That there was not a proper hearing. The petition of the railroad company was presented at a regular meeting of the council held July 8th, 1896, and the consideration thereof was set for a special meeting on July 28th, 1896, of which notice was duly posted and published. The hearing at that meeting and the meeting itself were adjourned from time to time until March 4th, 1897, when the ordinance was passed. It was approved by the mayor March 8th, 1897. The authority of the act of 1896 is " that upon the date fixed by such notice, or upon such subsequent date as the hearing of the said matter may be adjourned to," the ordinance may be passed. The argument is that only one adjournment is permissible. This argument is without foundation. Continued adjournment of the hearing until a decision is reached is contemplated by the statute. It is complained that the adjourned special meeting was sometimes held on the night of a regular meeting of the council and that citizens may have been misled, but we see no indication of any misunderstanding and certainly the course pursued was not illegal. None of the prosecutors claim to have been misled. Proof is offered of some statements, at the hearings, of the company's intentions not afterward fulfilled and of a failure of the council to consider certain objections presented. All this proof is irrelevant. 2. That the ordinance did not re-

ceive a sufficient number of votes.   Three members were present at the meeting; two voted for and one against the ordinance.   The mayor has no vote except in case of a tie, but as he approved the ordinance it is plain that the result would not have been different had the absent member attended and voted against the ordinance.   The prosecutors first invoke the provision of the act of 1890 for a majority vote of all the council to pass an ordinance, but that act had been repealed. They then point out that the act of 1878 provides for six members of council, and argue that either there should have been two members appointed by the others, or if the power of appointment to offices given by the Borough act of 1896 did not extend to membership in the council itself (as clearly it did not), then, at least, it should be held that all four members, as a majority of six, were necessary to a quorum.   We cannot read this provision into the act.   The language used is very plain.   The existing governing body of every borough under the repealed statute became an *ad interim* council, to continue until the next annual election, when a board of six members was to be elected under the act of 1878.   In the meantime the ordinary rules governing municipal legislatures would of course apply.   It is well settled that if there be no statutory restriction a majority of such a body is a quorum, and that a majority of a quorum may act.   *McDermott* v. *Miller*, 16 *Vroom* 251 ; *Cadmus* v. *Farr*, 18 *Id.* 208 ;  *Barnert* v. *Paterson*, 19 *Id.* 395.   Lastly, that when the ordinance was first introduced and read, the consents of landowners had not been filed, although their filing was recited therein, and that there was substantial amendment of the ordinance at the meeting of its final passage.   This objection is based upon the idea that the ordinance could not be passed without submission at a previous meeting.   Even if this were so there would be nothing in the suggestion that the proviso of the Street Railroad act of 1896, that permission to construct, &c., shall not be granted " in whole or in part " until the requisite consents are filed, forbids the introduction of the ordinance until such consents are filed.   The quoted words refer to the

route, not to the proceedings, and it would be sufficient if the consents were at hand when the ordinance came up for final passage, even if a submission thereof at a previous meeting was necessary. It may be conceded that, if such previous submission were necessary, there could be no substantial amendment at the time of passing the ordinance, but there is no such necessity. The Borough act of 1878 does indeed require that all ordinances shall be submitted in writing at a regular meeting and be acted upon at a subsequent meeting, but this requirement is evidently superseded by the Street Railroad act of 1896 as to ordinances within its purview, for that statute provides for a special meeting on notice ordered by the council, and in terms enacts that, upon the date fixed by the notice, an ordinance may be passed granting permission to construct, maintain and operate the railroad, including poles, wires, conduits and other structures and appliances appropriate or necessary therefor. The location of tracks and poles may be then or subsequently fixed and determined by resolution. Of course, this may be done by the resolution passing the ordinance. The effect of the act is to prescribe a uniform procedure for all municipalities.

We find no illegality in the ordinance under review, and it is therefore affirmed, with costs.