BENJAMIN F. SHEPARD ET AL., PROSECUTORS, v. THE MAYOR AND COUNCIL OF EAST ORANGE ET AL.

JOEL F. FREEMAN ET AL., PROSECUTORS, v. THE MAYOR AND COUNCIL OF EAST ORANGE ET AL.

Argued November 11, 1902—Decided January 16, 1903.

1. Under *Pamph. L.* 1896, *p.* 329, the real owner of land in possession may effectually consent to the construction, maintenance and operation of a street railway, although the mere legal title may be vested in another person.

2. The public hearing, by said act directed to be given by the governing body of a municipality applied to for a grant of permission to construct, maintain and operate a street railway, may be given before the introduction of the granting ordinance.

3. Adjournment of the advertised meeting is adjournment of the hearing.

4. If ample opportunity to be heard has been afforded, such governing body may, at a time and place to which it has adjourned the advertised meeting, proceed, without further hearing of objections, to its consideration of the application and action thereon.

5. A reservation, in an ordinance granting permission to construct, maintain and operate a street railway, of power to change by reso-

lution the location of tracks and poles on application of the railway company, will not avoid the ordinance.

6. A provision in such an ordinance to fix by arbitration the compensation to be paid for the permission granted, after the expiration of a time during which such compensation has been fixed therein, will not avoid the ordinance.

7. A street railway company that has leased its property and franchises to another company, on terms that after-acquired railroads shall come under the lease without increase of rent, may lawfully be the applicant to a municipality for permission to construct, maintain and operate an extension of a street railway embraced in the lease.

On *certiorari.*

Before Justices DIXON, COLLINS and HENDRICKSON.

For the prosecutors, *Sherrerd Depue.*

For East Orange, *Philemon Woodruff.*

For the Consolidated Traction Company, *Chandler W. Riker.*

The opinion of the court was delivered by

COLLINS, J.   The writs in this cause remove to this court for review an ordinance passed by the city council of East Orange on April 28th, 1902, approved by the mayor of that city on May 3d, 1902, granting permission to the Consolidated Traction Company to construct, operate and maintain a double-track electric street railway, by the overhead trolley system, on Central avenue, between the Newark city line and the Orange city line, in the city of East Orange, and prescribing the location of tracks and poles, and imposing terms and conditions.   The authorizing legislation is "An act to regulate the construction, operation and maintenance of street railroads in this state," approved April 26th, 1896.   *Pamph. L., p.* 329.

I will take up the objections urged against the legality of the ordinance in the order of the brief of counsel for the prosecutors.

FIRST AND SECOND—LACK OF NECESSARY CONSENT OF
PROPERTY OWNERS.

The provision of the statute is "that such permission to construct, maintain and operate a street railway shall in no case be granted, in whole or in part, until there shall be filed with the clerk of such governing body or other equivalent officer the consent in writing of the owner or owners of at least one-half in amount of lineal feet of property fronting on the streets, highways, avenues and other public places, or upon the part of the street or streets, highway or highways, avenue or avenues and other public place or places through or upon which permission to construct, operate and maintain a street railway is asked, and any such consent may be signed by an attorney in fact, thereunto duly authorized by any owner, or by an executor or trustee holding the legal title or having power of sale, which consents shall be executed and acknowledged as are deeds entitled to be recorded."

There is dispute as to measurements, but I will take those of the prosecutors. The requisite frontage, according to the brief of their counsel, is seven thousand one hundred and fifteen feet. Consents for five thousand nine hundred and sixty-nine and seventy-four hundredths feet are conceded to be valid. Others are challenged. One of those is that for the "Cemetery of the Holy Sepulchre," for nine hundred and sixty-nine feet, and if it is not sustained the prosecutors must prevail, for without it there would not be consent by the owners of one-half in amount of lineal feet of property fronting on Central avenue along the line of the proposed railway. If sustained, it is needful to look only for valid consent for one hundred and seventy-six and twenty-six hundreths feet. There is much more than that frontage as to which, in our opinion, the objections of the prosecutors are untenable. One case will suffice—that of William Seyd, whose consent for one hundred and eighty-nine and sixty-six hundredths feet was duly signed and acknowledged and

admittedly filed in due time. It is· challenged because there is added to it these words: "Provided, said railway is in operation one year from date." We think that this proviso simply created a condition subsequent that did not nullify the consent *in præsenti.* The condition may easily be fulfilled, or, if not, may be waived. A similar consent was upheld by this court in *Hutchinson* v. *Belmar, 32 Vroom* 443, 450; *affirmed, 33 Id.* 450.

The consent for the cemetery property is challenged because not filed with the city clerk before the introduction of the ordinance and because Bishop O'Connor, who signed and acknowledged it, had not, up to the time of the passage of the ordinance, legal title to the property.

The first ground of challenge may be disposed of adversely to the prosecutors, on the authority of *Hutchinson* v. *Belmar, ubi supra.* It was held in that case (at *p.* 450) that it is sufficient if the required written consents are at hand when the ordinance comes up ·for final passage. It is urged that this deliverance was *obiter.* It nevertheless accords with reason, and we now reaffirm it. In most cases, as in that before us, the advertised meeting to consider an application, under the statute, is adjourned from time to time, and the ordinance is prepared with much deliberation. If it were the legislative intent that the filing of the prescribed consents should precede municipal consideration, it would seem that the governing body of the municipality could not, without them, even fix a time and place for a hearing on the application—which would be a most unreasonable interpretation of the act. Counsel for the prosecutors is driven to contend for it, but his argument is not persuasive. It seems quite plain that the municipal consent and the private consent are distinct. Efforts to secure the two essentials may well proceed *pari passu.* The only restriction is that the granting ordinance must await final passage until the requisite private written consents shall be filed.

The second ground of challenge presents a new question. The land devoted to the cemetery was, in 1865, conveyed, by private owners, to "James Roosevelt Bayley, D.D., bishop

of Newark." It was consecrated according to the rites of the Roman Catholic Church; it has ever since been possessed and controlled and its revenues have at all times been received and disposed of at will for diocesan purposes by the bishop, or administrator for the time being, of the diocese of Newark, which includes all of the county of Essex. It is a general cemetery, not attached to any parish. For a time the legal title was vested in St. Patrick's Church, Newark, to which corporation Bishop Bayley, for a nominal consideration, conveyed it; but this was merely for some purpose of convenience. That church corporation had no interest in the property, and on July 22d, 1882, in order to revest the title in the bishop of the diocese, conveyances were made, through Reverend Dennis McCartie, as a conduit, effecting that result. Right Reverend Winand Michael Wigger was then bishop of the diocese and also president of the board of trustees of St. Patrick's Church. The deed from Father McCartie to the bishop describes the grantee only by name, but the proof is plenary that the property belonged to the bishop as representative of the diocese, and not to the private individual. Bishop Wigger died January 5th, 1901, leaving a will devising all his property to Archbishop Corrigan and Bishops McDonnell and McQuaid as joint tenants. Reverend John J. O'Connor was consecrated bishop of Newark on July 25th, 1901, and at once succeeded to the control and usufruct of the cemetery property. The consent in question was afterwards given by him as "bishop of Newark." Since the allowance of the pending writs the surviving devisees of Bishop Wigger have conveyed to him the legal title of the property.

The contention for the prosecutors is that, at the time of the passage of the ordinance, no effective consent to its grant could, under the statute, be given for the cemetery frontage, except by the devisees of Bishop Wigger. This contention, for reasons to be stated, cannot prevail. Whether such devisees were competent as "trustees holding the legal title" to execute the writing need not be decided.

The *status* of property of the Roman Catholic Church in this country is peculiar. The civil courts, even as to property

rights, will recognize ecclesiastical polity where not incon-
sistent with the law of the land. *Morgan* v. *Rose, 7 C. E.
Gr.* 583; *Fair* v. *First Methodist Episcopal Church of Bloom-
ingdale,* 12 *Dick. Ch. Rep.* 496; *affirmed,* 15 *Id.* 485. This
doctrine, as applied to the Roman Catholic Church, was ably
discussed and upheld in the Supreme Court of Ohio, in *Man-
nix* v. *Purcell,* 46 *Ohio St.* 102.

It has been proved in the present case by eminent church-
men that the authoritative declaration of the polity in this
country of that church is in the acts and decrees of the Third
Plenary Council of Baltimore, held in 1884. These acts and
decrees are in Latin, but we have been favored with sworn
translations, from which I gather that the normal system of
holding and transmission of diocesan property is through the
bishop of the diocese, either as a corporation sole or as an
individual. In states like New Jersey, where parochial and
ecclesiastical incorporation is permitted, property may be
held by bodies so incorporated, but I do not understand that
to be compulsory, and where there is no such corporation
formed to hold non-parochial property, the bishop must hold
it. The bishop is required, within three months after con-
secration, to make, in duplicate, and deposit in a designated
way, a testamentary disposition of the property of the diocese,
so as to secure its safe transmission to his successor. The
testimony is that the practice is to do this by a devise to three
bishops, who convey to the successor of the decedent. This
was the method adopted by Bishop Wigger and effectuated
by his surviving devisees. The conveyance had not actually
been made to Bishop O'Connor when he signed the challenged
consent, but he was in possession of the property, in all
essentials its owner, with absolute control and dominion
over it.

Let us now apply to this situation the words of the statute.
The authoritative consent must come from the real owner.
The writing *may be signed* by an attorney in fact, or by an
executor or trustee if he holds the legal title or has a power
of sale. The connotation of executors and trustees with

attorneys in fact is suggestive. The class created is purely representative, and the essence of authority to consent is the element of dominion. There is no good reason why the real owner may not alone give the consent and effectively execute the writing in all cases where it can be established that the legal title, though vested in another, is so vested as a mere matter of form.

We think Bishop O'Connor was the owner of the cemetery property, within the purview of the statute, and that his written and acknowledged consent affords support for the ordinance.

### THIRD, FOURTH AND FIFTH—INSUFFICIENCY OF THE PUBLIC HEARING.

The objections I thus group together present various aspects of the case, and may best be met by a short statement of the requirements of the act as the court understands them. The tenor of the petition to the governing body of the municipality is not prescribed, but may be implied from the notice of its consideration required to be published, which must state the character of the road intended to be constructed, the motive power to be used thereon and the streets or other public highways or places through which the same shall extend. The petition must, indeed, be accompanied with a map or description of the route of the proposed railway, showing also the proposed location of rails or tracks and the location of poles or conduits, but the granting ordinance need not adopt such locations or any location. The ordinance need do no more than grant permission to construct, maintain and operate, by the described power, a street railway upon the designated streets, highways and places or parts thereof. The details of location may be fixed and determined in the ordinance or by a resolution, passed at the same time or at a subsequent time.

The requirement of notice, of course, involves a public

hearing, and the provision of the act is "that upon the date fixed by such notice, or upon such subsequent time as the hearing of the matter may be adjourned to, the said governing body may, by ordinance and not otherwise, grant, or, by resolution, may refuse," &c. So there must be hearing; but, as to the public, only on the question of the granting or refusing the permission applied for. Abutting owners, when the location of poles is to be considered, may, perhaps, be entitled to be heard (*Kennelly* v. *Jersey City,* 28 *Vroom* 293, 295), but where property rights are not involved, notice of proposed municipal action of the character of that before us is not, in the absence of statutory direction, a matter of right. *Id.; Moore* v. *Haddonfield,* 32 *Id.* 470; *affirmed,* 33 *Id.* 386. Consequently it is quite immaterial whether the opportunity to be heard on a street railway petition, under the statute, is afforded before or after the ordinance, in pursuance of it, is introduced or before or after one or more adjournments of the matter. In this view most of the criticisms made for the prosecutors on the action of the East Orange council are outside of the range of legal complaint. The requirements of the act were fully complied with and ample opportunity to be heard on the vital questions was afforded. There were several adjournments, and at all but the last session anyone desiring to speak was given audience. At the first session there was, at the request of persons opposing the grant of permission, an adjournment of sixteen days, to a large public hall, and new notice was published. It is complained that at that session, at which many persons were heard, there was a limit set of five minutes for each speech; but at the later sessions there was no such limit, and the only complaint seriously urged is that, at the session at which the ordinance was passed, objectors were not allowed to be further heard on the terms and conditions of the ordinance. The opportunity to be heard on all phases of the case extended at the previous sessions was ample, and the council was justified in devoting the last session to its own consideration of the matter. It is claimed that the minutes do not

show that the "hearing" was adjourned from time to time to the date on which final action was taken, and that therefore the proceeding failed. This is hypercritical. The sessions taken together constituted but one meeting, and not only was that meeting always adjourned to a specified time, but the consideration of the pending application was expressly likewise adjourned. The "hearing" had to cease at some stage before the council's action on the proposed ordinance. The minutes show that at the session of April 14th, 1902, after some amendments to the pending ordinance, no one responded to the chairman's offer of further hearing, and it was moved and carried that the ordinance as introduced and tentatively amended should be taken up for second reading and final action on April 28th, 1902. This was a sufficient adjournment. The clerk was instructed to write to various objecting associations and committees that had sent communications requesting to be heard that the council deemed it inadvisable to have further hearing, and to suggest that they embody their views in writing to be sent to the council. At the final session some such communications were received. I cannot see any defect or inadequacy in the public hearing afforded. There were some slight changes in the location of poles, but no abutting owner affected is complaining, and no objection of lack of notice and hearing on that subject is made in the filed "reasons."

SIXTH—ILLEGALITY IN RESERVING RIGHT TO CHANGE
LOCATION OF POLES BY RESOLUTION.

It is conceded for the prosecutors that the council need not have designated such location in the ordinance, but having done so, the claim is that it was not competent to provide for change, by resolution, on the application of the street railway company. There seems to me no force in this objection, but if there be any, it is only subversive of the reservation, not of the ordinance.

SEVENTH—UNCERTAINTY IN THE COMPENSATION EXACTED
FOR THE PERMISSION.

The ordinance imposed, as a condition, a tax of two per
cent. on gross receipts, with a yearly minimum of $1,000, for
fifty years; subsequent compensation to be fixed by arbitra-
tion. It is argued that the provision for arbitration avoids
the whole ordinance for uncertainty. It was competent,
though not compulsory, for the council to exact compensa-
tion. The recent case of *Fielders* v. *North Jersey Street
Railway Co.,* 39 *Vroom* 343, 361, upholds the right to make
such contracts. The whole matter, being extra statutory, is
left to the council's discretion. We see no legal objection to
a contract for arbitration. It is a reasonable method for de-
termining, in the distant future, the value of a right whose
valuable elements cannot now be ascertained, and will render
certain what is now necessarily uncertain. Should the com-
pany, at the end of the term, refuse to submit to arbitration,
doubtless the public will find means of redress.

EIGHTH—INCAPACITY OF THE CONSOLIDATED TRACTION COM-
PANY TO APPLY FOR OR RECEIVE THE PERMISSION OF
THE ORDINANCE.

This objection is based on the fact that, in 1898, the trac-
tion company had leased, for nine hundred and ninety-nine
years, all its property and franchises to the North Jersey
Street Railway Company.

I do not see how this concerns the prosecutors. The trac-
tion company is still a street railway company. The consents
of property owners were given to the traction company, its
successors or assigns. The permission granted will simply
enure to the benefit of its lessee. The case shows ratification
by the lessee, and the lease, in evidence, expressly provides

for after-acquired railroads coming under its terms without increase of rent. The proposed street railway is an extension of one owned by the traction company and included in the lease, and it was manifestly proper that the title and incidents should be taken in its name.

The United New Jersey Railroad and Canal Company made a like lease to the Pennsylvania Railroad Company in 1871, validated by the legislature of this state in 1873 (*Pamph. L. p.* 1298), yet condemnations of land for improvements and additions to the leased railroad have always been made by the lessor. Many have been contested by the landowners, but no question of lack of power to condemn has ever been raised, and the condemnations have been sustained. *Beck* v. *United, &c., Co.,* 10 *Vroom* 45; *United, &c., Co.* v. *Weldon,* 18 *Id.* 59.

In *Slingerland* v. *Newark,* 25 *Vroom* 62, this court sustained a condemnation by a city of land for a water-pipe line, which a private corporation had contracted to acquire, subject to the right of the city to purchase.

We see no infirmity in the ordinance under review, and it will be affirmed, with costs.