# CASES AT LAW

# COURT OF ERRORS AND APPEALS

OF THE

## STATE OF NEW JERSEY.

NOVEMBER TERM, 1903.

---

BENJAMIN F. SHEPARD ET AL., PROSECUTORS AND PLAINTIFFS IN ERROR, v. THE MAYOR AND COMMON COUNCIL OF EAST ORANGE ET AL., DEFENDANTS IN ERROR.

Argued November 19, 1903—Decided February 29, 1904.

1. Upon the application of a trolley company to the city of East Orange for permission to construct, maintain and operate a street railway on Central avenue, in said city, various consents of the owners of property abutting on the avenue were duly presented to the city authorities, pursuant to the provisions of the Street Railroad act of April 26th, 1896. *Pamph. L.*, *p.* 329. One of the consents was given by John J. O'Connor, bishop of Newark, as owner, or representing the ownership of the cemetery of the Holy Sepulchre, which had a frontage of nine hundred and sixty-nine feet upon the avenue. If that consent was invalid, there were not consents of the owners of a sufficient number of lineal feet of frontage to give jurisdiction to the city to grant such permission. The cemetery land had been conveyed to Bishop Bailey, Roman Catholic bishop of the diocese of Newark, by a deed conveying title in fee-simple, with no express declaration of trust. It had been conveyed by mesne conveyances of like character to Winand Michael Wigger, bishop of that diocese. By his will it was devised to three prelates of that church as joint tenants, and the title thereto was in them at the time of Bishop O'Connor's

203

consent. Assuming (without deciding) that the evidence was competent to establish, and did establish, that land thus conveyed to the ecclesiastical authorities of that church is held upon a trust for the Roman Catholics of the diocese—*Held*, that at the time of the execution of the consent Bishop O'Connor, having acquired no legal title to the land, was not a "trustee holding the legal title," nor was he the owner of the land, as *cestui que trust* or otherwise, within the provisions of the act in question, and so his consent was invalid. *Quære.* Whether a *cestui que trust*, in possession of land the legal title to which is in a trustee, can give a valid consent under the act.

2. Whether municipal authorities may refuse to hear persons desiring to object to the sufficiency of such consents to justify action after all the consents are presented, because such persons had been previously heard in opposition to the action, *quære.*

On error to the Supreme Court. The opinion of that court is reported in 40 *Vroom* 133.

For the plaintiffs in error, *Richard V. Lindabury* and *Sherrerd Depue.*

For the defendants in error, *Philemon Woodruff* and *Coult, Howell & Ten Eyck.*

The opinion of the court was delivered by

MAGIE, CHANCELLOR. The judgment of the Supreme Court brought up by this writ of error affirmed the validity of an ordinance of the mayor and common council of the city of East Orange, approved on the 3d day of May, 1902. The purpose of the ordinance was to grant permission to a trolley company to construct, operate and maintain a double-track street railway on Central avenue, through the city of East Orange. The ordinance was brought before the Supreme Court by *certioraris* allowed to the plaintiffs in error and to others as prosecutors, objecting to its validity.

It was conceded in the Supreme Court, and in the argument here, that the action of the city council of the city of East Orange in the passage of this ordinance was not within its power, unless there had been filed with its clerk

the consent, in writing, of the owner or owners of at least one-half in amount of the lineal feet of property fronting on the avenue through which the street railway was proposed. The contention is that there had not been thus filed the consents of the owners of a sufficient number of lineal feet to satisfy the provisions in this respect contained in the first section of the act entitled "An act to regulate the construction, operation and maintenance of street railroads in this state," approved April 21st, 1896. *Pamph. L., p.* 329. That such consents are essential to the action of the city council is settled. *Currie* v. *Atlantic City,* 37 *Vroom* 140; *S. C., Id.* 671.

It was also conceded in the court below that if a consent purporting to be given by the owner of lands called the cemetery of the Holy Sepulchre, and abutting on the avenue in question for nine hundred and sixty-nine feet, was not a valid consent, the ordinance was not within the power of the city council to pass. The certificate of the engineer of the city, made to the municipality, makes this clear. He certifies the total frontage of the avenue to be fourteen thousand two hundred and thirty feet, one-half of which is seven thousand one hundred and fifteen feet. He certifies, further, that the number of feet of frontage for which consents had been filed was seven thousand two hundred and twenty-eight, being only one hundred and thirteen feet more than one-half the entire frontage. If the nine hundred and sixty-nine feet comprising the frontage of the cemetery be subtracted from the consents, the requirement of the act would not have been complied with, and, to use the language of the act, the city could not grant permission to construct, maintain and operate the street railway in question.

The facts disclosed by stipulation, or by the affidavits taken in the Supreme Court, regarding the situation of the land comprised within the cemetery of the Holy Sepulchre, are these: As long ago as 1865 the land was conveyed to James Roosevelt Bailey, Roman Catholic bishop of the diocese of Newark. The conveyance was in fee-simple, without the

expression of any trust. After Bishop Bailey acquired title by the last-mentioned deed, the land passed by diverse mesne conveyances unnecessary to specify, and was afterwards conveyed, by a deed dated July 22d, 1882, to Winand Michael Wigger, bishop of the diocese of Newark. All these deeds conveyed a title in fee-simple, with covenants of warranty and with no expression of a trust. Bishop Wigger died January 5th, 1901, leaving a last will and testament, whereby he devised all his real estate to the Most Rev. Michael A. Corrigan, archbishop of the city of New York; Right Rev. Charles E. McDonnell, bishop of the city of Brooklyn, and Right Rev. Bernard C. McQuaid, bishop of the city of Rochester. The devise was to those individuals, their heirs and assigns, as joint tenants, and not as tenants in common. Archbishop Corrigan died in May, 1902, and the title to the devised real estate thereby devolved upon the survivors, Bishops McDonnell and McQuaid. On August 14th, 1902, the surviving devisees conveyed the land in question to John J. O'Connor, who had been installed as bishop of the diocese of Newark, in the place of the deceased Bishop Wigger, on July 25th, 1901. The consent upon which the ordinance was sustained was dated April 12th, 1902. It was signed by John J. O'Connor, bishop of Newark, and expressed the consent of the said bishop as "owner of or representing the ownership of" nine hundred and sixty-nine lineal feet on Central avenue, in East Orange. It will be observed that this consent was given after the installation of Bishop O'Connor, and before the devisees under the will of Bishop Wigger had conveyed to him any title to the land.

It is obvious that at the time Bishop O'Connor signed the consent the legal title to the land was not in him, but was in the three prelates who were the devisees of Bishop Wigger. His consent, therefore, was not the consent of an owner, so far as ownership was acquired by transfer of title, and its terms indicate that it was made either by him as owner or as representing an ownership in the land.

But the contention in behalf of the city and the trolley

company is that the ownership of this land has been in the various grantees thereof above mentioned, burdened with a trust. It is insisted that such land, when held and controlled by the prelates of the Roman Catholic church, is in fact church property, held by the successive grantees for the benefit of the Roman Catholic church. In support of this contention, evidence was given in the Supreme Court that this land had been used as a place of burial for the Roman Catholics of the diocese of Newark, under the management and control of the bishop for the time being, or some agent appointed by him. There was also evidence respecting the laws and practice of the Roman Catholic church in regard to property thus held and managed. Our attention was also called to the case of *Marnick* v. *Purcell,* 19 *N. E. Rep.* 572, as a judicial determination that upon such evidence lands conveyed to a bishop of that church, in fee and without any express trust declared in the conveyances, may be adjudged to be burdened with a trust as church property.

In my judgment it is unnecessary, and therefore inexpedient, to express any opinion on this question. For, if it be assumed that the land in this case was burdened with a trust established by the evidence, it was a trust for the benefit of the diocese of Newark, for all of the Roman Catholic faith to be buried there, with the permission and under the authority of the bishop who held the title thereto. If it may be further assumed that by the canons of the Roman Catholic church in this country, a bishop holding the title to such lands is bound, within a specified time after consecration, to make a testamentary disposition thereof to three prelates of the same church, and that upon the bishop's death and the consecration of his successor the devisees are required to convey the land to the newly-consecrated bishop, the situation is plain. The living bishop holding the title is, on this theory, a trustee for a specified purpose. His devisees take the title burdened with the same trust. The succeeding bishop does not become trustee by his consecration, but only by the acquisition of the title burdened with the same trust.

The act empowering municipalities to give permission for the construction of street railways upon public highways requires the consent of the owners of abutting property to be in writing, and to be executed and acknowledged as deeds entitled to be recorded. It does not require the consents to be executed by the owner in all cases, but expressly permits any consent to be signed by an attorney in fact, duly authorized by the owners, or "by an executor or trustee holding the legal title or having power of sale." This permission, however, does not avail to make valid the contested consent of Bishop O'Connor, unless he was at its date the owner of the land, because, as we have seen, he did not become trustee holding the legal title until after that time.

It is obvious, then, that the consent can only be pronounced valid upon the theory adopted in the Supreme Court, viz., that Bishop O'Connor was in fact the real owner of the land, within the intent of the legislation in question, at the time he executed it. This involves a construction of that act which is novel and important. Under that construction, a *cestui que trust* in possession of land may validly consent to the construction of a street railway, although the legal title to the land may be in a trustee who, by the express language of the proviso, is also entitled to consent. It may be difficult to discover a reason why the *cestui que trust,* being the real owner, was not expressly empowered to consent. But it must be remembered that it is for the legislature to prescribe the mode in which such consents should be made to appear, and it is open to serious question whether, when it expressly empowered trustees holding the legal title to consent, it did not impliedly exclude a consent by the *cestui que trust.*

But this question is not, in my judgment, necessary to be decided, because I fail to discover in Bishop O'Connor, at the time in question, any real ownership or dominion over this land. The legal title was in the devisees of Bishop Wigger, burdened, as we have assumed, with a trust for the Roman Catholics of the diocese of Newark. That the ceme-

tery was carried on while the title was in the devisees, under the direction of Bishop O'Connor, does not indicate that he had any ownership or dominion, but rather that he was acting as their agent in the performance of the trust. He was entitled, under the laws of the church, to require the devisees to invest him with the title, but until that was done he had no ownership, and was not a *cestui que trust* in any sense. When invested with title he took the land, not as his own property, but as property burdened with a trust for the diocese.

The result is that his consent was wholly invalid and incapable of conferring upon the city council any power to grant permission to construct the trolley road in question.

This result renders unnecessary the consideration of another point of great interest and importance, but it is deemed wise to indicate what the point is and to expressly decline to pronounce any opinion thereon.

In the court below the facts were deemed to disclose that the city council had given many successive hearings, upon published notice, as required by the statute, and that many such hearings were had after the ordinance had been presented and while it was on its passage, in various stages, through the council, and while the consents were being obtained upon which its final passage was claimed to be proper. After the consents had all been presented and the ordinance was ripe for final passage, further hearing was demanded and refused by the council, and this refusal was sustained by the court below, as justified, by reason of. the many and exhaustive hearings which had previously been granted.

. The respective contentions under this state of facts are these: On the one hand it is insisted that the hearing required by. the act is for the sole purpose of permitting citizens to lay before the council the propriety or impropriety of the action proposed, looked at only in the view of public utility and convenience, and that those protesting against action have no right to contest the sufficiency of the consents obtained, and that this doctrine has been settled by

the judgment of this court, affirming the judgment of the Supreme Court, in *Hutchinson* v. *Belmar,* 32 *Vroom* 443; *S. C.,* 33 *Id.* 450.

On the other hand, it is contended that the expression of opinion in the case cited was unnecessary to the decision or inapplicable to the circumstances of this case; that the public hearing required by the act was designed to give opportunity to any citizens to lay before the council or governing body of the municipality any reasons against action, and that such reasons would include deficiency of required consents, for want of which jurisdiction would not exist in the council to act, and that an application to be heard after the consents were all presented, for the purpose of exhibiting their deficiency, was one that the council could not ignore and reject because hearings had been given before the consents had all been brought in.

This question is of great importance, but as its decision is unnecessary to the disposition of the case it is deemed wise not to express any opinion thereon.

The result is that the judgment of the Supreme Court affirming the ordinance in question must be reversed and a judgment entered pronouncing it invalid. A like result is reached upon the writ of error sued out by Joel F. Freeman and others against the same defendants in error, which was argued with that previously discussed.

*For affirmance*—None.

*For reversal*—The Chancellor, Chief Justice, Garrison, Fort, Pitney, Swayze, Bogert, Vredenburgh, Vroom, Green. 10.